IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AMANDA KEPIC,**                           Case No. 1:17 CV 2422

     Plaintiff,                          Judge Sara Lioi

     v.                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                         REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Amanda Kepic ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 20, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB in February 2015, alleging a disability onset date of December 3, 2011. (Tr. 455-57). Her claims were denied initially and upon reconsideration. (Tr. 392-400, 402-08). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") ALJ on June 15, 2016. (Tr. 314-56). On August 26, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on November 20, 2017. (Doc. 1).

### FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in November 1982, making her 29 years old on her alleged onset date. *See* Tr. 455. She alleged disability due to lupus (associated with chronic pain), depression/anxiety, migraines, asthma, fibromyalgia, restless leg syndrome, cardiac issues (including but not limited to postural orthostatic tachycardia syndrome ("POTS")), iron deficiency, and gastroesophageal reflux disease ("GERD")/gastrointestinal issues. (Tr. 476). Plaintiff graduated from high school, attended college, and completed medical assistant training. (Tr. 477). She had past relevant work as a medical assistant. *See* Tr. 327, 349. Plaintiff was fired from her job for missing too many days of work due to lupus flares. (Tr. 329-30).

At the time of the hearing, Plaintiff lived with her parents. (Tr. 322-23). For household chores, Plaintiff loaded the dishwasher, cleaned her room, and made short shopping trips ("If I runt to the pharmacy to pick up my meds, I'll grab a few things, but that's about it."). (Tr. 323-24). She did not cook, and mostly did not eat while her parents were at work during the day. (Tr. 323). She cared for her personal needs, but explained she did not shower every day because she "just [did not] have the energy to stand there." (Tr. 324). Plaintiff drove, with her longest trip in the past year being an hour long. *Id.* Plaintiff had two dogs she walked approximately once per week; her mother walked them the other days. (Tr. 327).

During the day, Plaintiff liked to read, watch television, and check Facebook and online lupus support groups. (Tr. 325-26). Plaintiff had a few friends with whom she would get coffee once every few weeks. (Tr. 326). She spent most of her days in bed due to pain and fatigue. *Id.*

2

Plaintiff believed lupus was the biggest problem preventing her from working. (Tr. 331). It caused joint pain and swelling, hand tremors, fatigue, muscle pain, shortness of breath, chest pain, and kidney infections. (Tr. 334-35). The shortness of breath worsened with exertion. (Tr. 336). Plaintiff had twenty migraines per month. (Tr. 336-37). She took medications for lupus, which caused side effects of fatigue, dry mouth, and risk of infection. (Tr. 331-32). She also underwent monthly IV infusions starting in 2013 as part of her lupus treatment. (Tr. 331). The infusions took approximately three hours and left Plaintiff feeling fatigued. (Tr. 332). Plaintiff used anti-inflammatories and elevated her legs to treat the swelling, and underwent vitamin B12 shots to help with fatigue. (Tr. 335). Plaintiff also took medication to treat migraines and fibromyalgia pain (Tr. 337-38).

Plaintiff had pain with daily activities. *See* Tr. 340-41. Specifically, she noted she walked slowly due to hip pain, and could only walk for ten minutes. (Tr. 340). She estimated she could not stand for more than an hour at a time. *Id.* Standing in one place for too long caused pain, as did holding her arms up, such as to wash her hair. (Tr. 341). Plaintiff had difficulty reaching overhead and forward. *Id.* She estimated that for every good day she had, four bad days followed. *Id.*

In 2012, Plaintiff traveled to Mexico for a week with her family. (Tr. 333). She had swelling in her feet, ankles, and legs, and the sun made her tired and achy. *Id.* She spent her time in bed or sitting in the shade. (Tr. 342). In 2016, she traveled to Disney World with her mother for six days, traveling around the park in a wheelchair. (Tr. 344).

<u>Relevant Medical Records</u>[1]

In 2012 and 2013, Plaintiff reported pain, sleep difficulty, fatigue, and mental health symptoms related to her lupus medications. *See* Tr. 593-94, 602-03, 631-35, 736-38 (mental health treatment notes).

In April 2013, Plaintiff saw Virginia Edwards, CNP, in the MetroHealth Neurology Department. (Tr. 790-95). She reported a history of lupus and migraines. (Tr. 792). She had past relief from Topamax, but headaches worsened over the prior year, and recently increased to about four times per week. *Id.* Ms. Edwards suspected Plaintiff's medications (Wellbutrin and possibly Benlysta) were causing her increased headaches. (Tr. 794). She continued Topamax, and advised Plaintiff to discuss alternatives medications with her prescribing providers. *Id.* Ms. Edwards advised she might consider adding Atenolol if medications could not be changed. (Tr. 795).

In September 2013, Plaintiff presented to Geetu Pahlajani, M.D., with tiredness and weakness. (Tr. 726). She had pain all over, primarily in her arms and legs. *Id.* Her physical examination was unremarkable. (Tr. 728-29). Dr. Pahlajani assessed lupus and hypothyroidism, and ordered lab tests. (Tr. 729). Plaintiff returned to Dr. Pahlajani later that month again reporting generalized pain. (Tr. 711). He noted her recent blood work was normal. . *Id.* On examination, she had tenderness "at multiple points" in her back, neck, and back of her knees. (Tr. 714). Dr. Pahlajani assessed hyperlipidemia, hypertension, and fibromyalgia. (Tr. 715). He prescribed Ultram for the fibromyalgia and instructed Plaintiff to follow up with rheumatology. *Id.*

---

1. Plaintiff raises a single argument regarding the ALJ's evaluation of her treating rheumatologist's opinion regarding her physical limitations. *See* Doc. 12, at 7-14. As such, the undersigned summarizes the medical records related to Plaintiff's physical limitations, and not those associated with her mental health treatment. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief deemed waived).

Plaintiff returned to Ms. Edwards in September 2013 complaining of migraine headaches two to four days per week, and approximately fourteen days per month. (Tr. 748). She also reported pain and an "agitated feeling" in her legs for over a decade. *Id.* Ms. Edwards noted Plaintiff would stop Wellbutrin, and reduce Topamax and Gabapentin. (Tr. 751).

In October 2013, Plaintiff saw Van Warren, M.D., for a three month follow-up visit. (Tr. 1367-70).[2] Plaintiff reported pain all over, especially in her right hip. (Tr. 1367). She noted her musculoskeletal pain worsened over the prior two months, woke her from sleep, and was not relieved with Vicodin. *Id.* Her headaches continued despite reducing her Gabapentin dosage. *Id.* On examination, Dr. Warren noted good range of motion of upper and lower extremity joints. (Tr. 1369). Plaintiff had "mild tenderness" in the upper extremities, upper back, and lower back; and "moderately in the proximal posterolateral aspect of the right thigh, and the left knee". *Id.* Her straight leg test was normal bilaterally in the seated position. *Id.* Dr. Warren assessed lupus, and continued Gabapentin (at an increased dosage) and Percocet. (Tr. 1369-70). Dr. Warren instructed Plaintiff to "do aerobic exercise as tolerated", and performed a pain injection in the right greater trochanteric bursa. (Tr. 1370).

In November 2013, Plaintiff saw Karen Majewski, CNP, in the MetroHealth Asthma Clinic. (Tr. 690-95). Plaintiff reported having controlled asthma since childhood. (Tr. 691). She had shortness of breath over the prior few months, worse with walking and climbing stairs. *Id.* Plaintiff used Albuterol every four hours without improvement. *Id.* Ms. Majewski assessed a

---

2. This appears to be the first record from Dr. Warren in the Transcript. There is another handwritten record dated July 2013 contained within the same Exhibit (possibly from Dr. Warren), but the physician's name is not clear. (Tr. 1231). At that visit, Plaintiff reported shoulder pain, and the physician noted good range of motion, but some tenderness in the right shoulder. *Id.* Plaintiff was assessed with lupus, fibromyalgia, migraines, and POTS; she was prescribed medication and instructed to follow up in three to four months. *Id.*

longstanding history of asthma with "normal spirometry on high dose laba/ics" and noted Plaintiff's symptoms were "out of proportion to these findings." (Tr. 694). Ms. Majewski ordered a chest CT scan to rule out pulmonary embolism, and instructed Plaintiff to continue her dosages of Dulera and Albuterol. (Tr. 695).

Plaintiff returned to Dr. Warren in December 2013, again reporting pain "all over". (Tr. 1363). Plaintiff noted an "intermittent tingling sensation in the right temporal region . . . tender to touch." *Id.* She had more frequent cold sores, swelling over her right elbow, night sweats, pain in her right shoulder, numbness in her right hand, discoloration of extremities with cold exposure, dry eyes, and dry mouth. *Id.* On examination, Dr. Warren noted tenderness over the medial humeral epicondyles bilaterally, right more than left; good muscle strength in both upper extremities, and diminution of the right radial pulse with Addison's maneuvers. (Tr. 1365). He assessed lupus and asymptomatic premature menopause. *Id.* Dr. Warren continued Plaintiff's medications, noted her temporal pain was most consistent with trigeminal neuritis, and ordered lab tests. *Id.* He instructed Plaintiff to return in three to four months. *Id.*

In April 2014, Plaintiff returned to Dr. Warren reporting: intermittent sweating and hot spells, fatigue, pain in her arms and legs, a rash from Percocet, pain in the lateral aspect of her hips, and lower back pain resulting from a March 2014 car accident. (Tr. 1359). Dr. Warren noted Plaintiff had fibromyalgia, lupus, and migraines. (Tr. 1362). She again had a pain injection. *Id.*

Plaintiff underwent a CT of her brain in June 2014 due to symptoms of headache and vomiting. (Tr. 1546). It showed no acute intracranial findings. *Id.*

In July 2014, Plaintiff again saw Dr. Warren for a three-month follow-up visit. (Tr. 1355). She reported pain in her right knee with swelling after a fall, pain in the lower back, numbness in her right first toe, and discomfort in both arms from elbow to hand. *Id.* She reported improved

headache symptoms with taking Sumatriptan. *Id.* On examination, Dr. Warren noted good range of motion in her upper and lower extremity joints without effusions. (Tr. 1358). Plaintiff had soft tissue thickening of the right knee with tenderness, but a preserved range of motion. *Id.* Plaintiff also had mild tenderness in her wrists. *Id.* Dr. Warren noted Plaintiff had lupus, which was "stable except for myalgias". *Id.* He continued Plaintiff's medications, instructed her to obtain x-rays of her right knee, and to return in three to four months. *Id.* The x-ray showed no fracture or dislocation. (Tr. 1541).

A September chest CT scan showed no pulmonary embolus, and mild subsegmental atelectasis, but otherwise clear lungs. (Tr. 1539).

In October 2014, Plaintiff saw Dr. Warren reporting a recurrent sinus infection, and a new medication due to persistent tachycardia. (Tr. 1350). She had significant weight gain and noted pain in her hips, hands, and lower extremities. *Id.* On examination, Dr. Warren noted, *inter alia*, mild tenderness in Plaintiff's fingers, thighs, and ankles. (Tr. 1353). She had a good range of motion in the upper and lower extremity joints without effusions, and her straight leg raising test was normal bilaterally. *Id.* Dr. Warren noted Plaintiff had persistent tachycardia, lupus, arthralgias, and myalgias. *Id.* Plaintiff's pain was not relieved by Vicodin; she also took Gabapentin. *Id.* Dr. Warren referred Plaintiff to pain management "for assistance in managing chronic musculoskeletal pain" and prescribed Topiramate. *Id.*

Plaintiff returned to Dr. Warren in January 2015, complaining of: swelling and stiffness in her hands, and muscle spasms in her calves. (Tr. 1345). She took Daypro twice per day "per pain management." *Id.* On examination, Dr. Warren noted "slight diffuse puffiness in the hands and wrists", "tenderness in the lateral aspect of the left elbow, normal range of motion in upper and lower extremity joints, no calf swelling, and a normal straight leg raise test. (Tr. 1348). Dr. Warren

7

noted Plaintiff had lupus, dyslipidemia, left lateral humeral epicondylitis, and fibromyalgia. (Tr. 1349). He continued Plaintiff's medications and instructed Plaintiff to add a magnesium oxide supplement. *Id.* She was to follow up in four months. *Id.*

At her next visit to Dr. Warren in April 2015, Plaintiff reported "generalized musculoskeletal pain" particularly in her elbows and thighs. (Tr. 1340). She further had nausea, and fatigue, as well as memory and concentration problems. *Id.* On examination, Dr. Warren noted "some slight soft tissue swelling in the dorsal aspect of the hands" as well as elbow, lower back, and thigh tenderness. (Tr. 1343). She had a normal bowel roll test, straight leg raising test, and no joint effusions. *Id.* Dr. Warren noted Plaintiff had fibromyalgia, lupus, fatigue, and general musculoskeletal pain along with a history of decreasing B12 levels despite injections. (Tr. 1344). He prescribed a permanent disability placard with a listed diagnosis of arthritis. *Id.* Dr. Warren also prescribed medication for nausea, and instructed Plaintiff to increase vitamin B12. *Id.* He again instructed her to follow up in three to four months. *Id.*

In June 2015, Plaintiff saw Richard Devans, M.D., at the Cleveland Clinic. (Tr. 1392-95). Plaintiff reported increased fatigue, right shoulder pain, poor sleep, night sweats, and weight gain from steroids prescribed due to lupus. (Tr. 1392). Plaintiff's physical examination was unremarkable. (Tr. 1393). Dr. Devans advised Plaintiff to work on weight loss and exercise for her fatigue, and prescribed a home sleep test. (Tr. 1392-93). He also advised Plaintiff to follow up with her rheumatologist regarding her lupus, consult a breast center regarding breast pain, and consult an orthopedic physician regarding her chronic right shoulder pain. (Tr. 1393-95).

A few days later, Plaintiff saw Joseph Hanna, M.D., at MetroHealth Neurology. (Tr. 1319-23). Plaintiff reported her headaches improved with Imitrex and she continued Topamax at night. (Tr. 1321). Dr. Hanna instructed her to follow up in six months. (Tr. 1323).

In July 2015, Plaintiff saw David Stepnik, M.D., at MetroHealth ENT. (Tr. 1714-18). Dr. Stepnik noted a sinus surgery appeared successful. (Tr. 1717). He also noted Plaintiff reported "[n]o headaches!" (Tr. 1714).

In September 2015, Plaintiff sent a message to Dr. Warren reporting "pretty severe pain for the past several weeks". (Tr. 1685). She was not on any pain medication, discontinued the Butrans patch because she was not seeing any results, and did not have relief form Vicodin. *Id.* She asked if she could re-start oxycodone. *Id.* Plaintiff also noted she was trying to get into the Cleveland Clinic's chronic pain rehabilitation program. *Id.* A staff member from Dr. Warren's office responded, stating he would check with Dr. Warren and follow up. *Id.* A few days later, Plaintiff followed up to say she did not want to take Percocet after all, because it caused itching. (Tr. 1683). She reported no relief from Vicodin. *Id.* At the end of the month, Plaintiff emailed again reporting she was no longer seeing her pain management physician and asked if Dr. Warren could prescribe the Daypro instead. (Tr. 1682). A staff member responded and said he would check with the doctor. *Id.*

In October, Plaintiff returned to Dr. Warren's office complaining of pain in her elbows, wrists, and knees. (Tr. 1677). She also reported continued fatigue, recurrent facial rashes, and dark colored urine, though urine cultures were negative for a urinary tract infection. *Id.* On examination, Dr. Warren noted Plaintiff had good range of motion in the upper and lower extremity joints without joint effusions. *Id.* Plaintiff again had "slight soft tissue swelling with moderate tenderness overlying the medial humeral epicondyle bilaterally" as well as mild pain with left wrist range of motion. *Id.* She had tenderness in her knees, but a normal straight leg raising test. *Id.* She had no peripheral edema and her neurological examination showed normal muscle strength in both upper and lower extremities. *Id.* Dr. Warren assessed fibromyalgia, lupus, hypercholesterolemia, chronic

9

fatigue, and bilateral humeral epicondylitis. *Id.* He continued Plaintiff's medications and added Amantadine. *Id.*

In December 2015, Plaintiff presented to the emergency room with a cough. (Tr. 1587). On examination, the treating physician noted Plaintiff was alert, in mild distress. (Tr. 1588). Her musculoskeletal examination was normal ("[n]ormal ROM, normal strength, no swelling"), as was her respiratory examination ("[l]ungs are clear to auscultation, respirations are non-labored"). *Id.* She was assessed with acute bronchitis and discharged. (Tr. 1589). Plaintiff returned to the emergency room later that month reporting difficulty breathing and right calf pain. (Tr. 1593). On examination, her musculoskeletal and respiratory examinations were again normal. *Id.* A chest x-ray was normal. (Tr. 1597).

Plaintiff returned to the emergency room again in January 2016 for left thumb pain, stating she had jammed the thumb while walking her dog eight weeks prior. (Tr. 1605). She reported joint pain, but no back or muscle pain. *Id.* On examination, the treating physician noted Plaintiff had normal range of motion and normal strength, and some tenderness in her right finger at the base. (Tr. 1608). An x-ray of her left hand was negative. (Tr. 1709).

Plaintiff returned to Dr. Warren in February 2016, reporting stiffness and locking of her left thumb for the prior three months. (Tr. 1672). She also reported developing sinusitis and pneumonia after a trip to Florida. *Id.* She experienced swelling in her feet from the airplane ride that persisted for her entire vacation. *Id.* Finally, she noted wheezing and pruritus when lying in bed at night. *Id.* On examination, Dr. Warren found Plaintiff's lungs were clear, she had no edema in her extremities, but she had superficial erosions on her right ankle and a large subcutaneous nodule in the flexor tendon of the left thumb. *Id.* He assessed flexor tendinitis of the left thumb,

fibromyalgia, and lupus. *Id.* Dr. Warren gave her a pain relief injection in her thumb, advised her to continue other medications, and follow up in four months. *Id.*

In October 2016 (after the date of the ALJ's decision), Plaintiff told Cathy Dobrowski, CNP that she had ten to fourteen headache days per month, and fifteen or more headache free days per month. (Tr. 259). She was treated with Botox injections. *Id.*

In November 2016, Plaintiff saw Rochelle Rosian, M.D., at the Cleveland Clinic in consultation for pain and fatigue and lupus. (Tr. 289). Plaintiff reported her appendix was removed two weeks prior, and she continued to experience residual fatigue. *Id.* On examination, Dr. Rosian noted painful shoulder movement and painful joints. (Tr. 293). Dr. Rosian assessed malaise and fatigue, lupus with rash, fatigue, and joint pain, and a sleep disturbance. *Id.*

*Opinion Evidence*

In April 2015, state agency physician Esberdado Villanueva, M.D., reviewed Plaintiff's records. (Tr. 366-68). He opined Plaintiff could perform light exertional work with additional postural and environmental limitations. *See id.* Specifically, he opined Plaintiff could frequently climb ramps or stairs, kneel, crouch, or crawl. (Tr. 367). She could occasionally stoop, and never climb ladders, ropes, or scaffolds. *Id.* He opined she should avoid concentrated exposure to noise, vibration, and pulmonary irritants; she should avoid all exposure to hazards such as machinery and heights. (Tr. 367-68).

In July 2015, Dr. Warren completed a Physical Functional Capacity Assessment form. (Tr. 1332-33). He opined Plaintiff could lift or carry ten pounds; stand or walk for about three hours in an eight-hour day; and sit about four hours in an eight-hour day. (Tr. 1332). He opined Plaintiff could sit or stand for thirty minutes before having to change position, and needed the opportunity to shift positions at will. *Id.* He also circled "yes" in response to the question: "Will your patient

need to lie down at times at unpredictable intervals during a work shift", but did not answer the follow-up question: "For what reason?" *Id.* In support of all his restrictions, he cited "fibromyalgia tender points, subjective fatigue, and recurrent urinary tract infections with exacerbations of fatigue and pain". (Tr. 1333). He opined Plaintiff could occasionally reach, finger, or push/pull; she could frequently handle or feel. *Id.* In support, he cited "intermittent swelling and tenderness in hands and fingers." *Id.* He also circled both "2-3x/month" and "More than 3xs/month in response to a question about how often he anticipated Plaintiff's impairments would cause her to be absent from work. *Id.*

Later in July 2015, state agency physician Gary Hinzman, M.D., reviewed Plaintiff's records and affirmed Dr. Villanueva's RFC determination. (Tr. 381-83).

VE Testimony

A VE also appeared and testified at the hearing before the ALJ. (Tr. 347-55). The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience who was limited in the way in which the ALJ ultimately found. (Tr. 350-51). The VE responded that such an individual could not perform Plaintiff's past work, but could perform other jobs such as cashier, electronics worker, and telephone solicitor. (Tr. 350-53).

The ALJ then asked a hypothetical based in part on the limitations to which Dr. Warren opined. (Tr. 353-54). The VE responded such an individual could not perform any jobs because the hypothetical did not allow for an eight-hour workday, because it limited the individual to standing and walking for three hours, and sitting for four (for a total of seven hours). *Id.*

ALJ Decision

In her written decision dated August 26, 2016, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2016, and had not engaged in substantial

gainful activity since her alleged onset date of December 3, 2011. (Tr. 13). The ALJ found Plaintiff had severe impairments of fibromyalgia, systemic lupus erythematosus, migraine headaches, valvular heart disease, POTS, obesity, asthma, affective disorder, and anxiety disorder; however, none of these impairments, individually or in combination met or medically equaled the severity of a listed impairment. (Tr. 13-14). The ALJ then concluded Plaintiff had the residual functional capacity

> to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. [She] can stand and walk for six hours of an eight-hour workday and sit for six hours of an eight-hour workday. She can perform unlimited pushing and pulling other than shown for lifting and carrying. [She] can frequently climb ramps and stairs, but never climb ladders ropes or scaffolds. She can frequently balance, kneel, crouch, crawl, occasionally stoop, but she should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, as well as all exposure to hazards like unprotected heights and hazardous machinery. [She] can perform frequent handling, fingering, and feeling bilaterally and she must alternate positions every thirty minutes between standing, sitting and walking. She can perform simple routine tasks with no fast pace or high production quotas and with infrequent changes where changes can be easily explained.

(Tr. 16). The ALJ found Plaintiff could not perform any past relevant work, but considering her age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that she could perform. (Tr. 20). Therefore, the ALJ found Plaintiff not disabled through her date last insured. (Tr. 21).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single objection to the ALJ's decision. She contends the ALJ erred in not affording controlling weight to the opinion of her treating rheumatologist, Dr. Warren. The Commissioner responds that the ALJ did not err, her decision is supported by substantial evidence, and it should be affirmed. For the reasons discussed below, the undersigned recommends the Commissioner's decision be reversed and remanded for further proceedings.

Treating Physician Rule

ALJs must adhere to certain governing standards when assessing the medical evidence supplied in support of a claim. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242–43 (6th Cir. 2007) (citing SSR 96–2p, 1996 WL 374188); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).[3] Generally, treating physicians are "the medical professionals most able to provide a

_____

3. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to

detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone"; thus, their opinions are generally given more weight than those of non-treating physicians. *Id.* Therefore, "if the opinion of the treating physician as to the nature and severity of a claimant's conditions is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record,' then it will be accorded controlling weight." *Id*. (quoting *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2).

If a treating physician's opinion is not given controlling weight, the ALJ must provide "good reasons" as to the weight given instead. 20 C.F.R. § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR 96–2p, 1996 WL 374188, at *5).

In providing "good reasons," the ALJ must weigh certain factors in determining how much weight to afford a treating physician's opinion. *See Wilson*, 378 F.3d at 544 (listing factors for the ALJ to consider to determine what weight is appropriate, including: length, frequency, nature, and extent of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; specialization of the physician; and any other relevant factors). "A failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a

---

claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243).

Importantly, the "good reasons" provided must be reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. A conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552. At the same time, the Sixth Circuit has recognized that an insufficient explanation may be harmless error "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Wilson,* 378 F.3d at 547. As the *Friend* court explained:

> [T]he procedural protections at the heart of the rule may be met when the "supportability" of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *Nelson v. Comm'r of Soc. Sec.,* 195 F. App'x 462, 470–72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 F. App'x 456, 464 (6th Cir. 2006). Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.

375 F. App'x at 551.

The ALJ here, after summarizing Dr. Warren's opinion, explained his consideration thereof:

> The undersigned gives little weight to this opinion, as there is no evidence [in] the medical record to support limiting the claimant to a sedentary exertional level, as her level of activities and physical examinations are not consistent with the limitation as previously indicated above.

(Tr. 18-19).

The undersigned finds this explanation fails to satisfy the "good reasons" requirement for a treating physician opinion and, contrary to the Commissioner's argument, it is not harmless error. The ALJ's explanation here falls short of explaining why Dr. Warren's opinion gets the short end of the stick, or with which evidence specifically the ALJ found it inconsistent. Notably, Dr. Warren offered several restrictions that are inconsistent with the ALJ's RFC: 1) lift or carry ten pounds; 2) stand or walk for three hours; 3) sit for four hours; 4) the need shift positions "at will"; 5) the need to lie down at unpredictable intervals; 6) occasional reaching, fingering, pushing/pulling; 7) an anticipated absence rate of either two to three, or more than three, days per month. *Compare* Tr. 1332-33 (Dr. Warren's opinion), *with* Tr. 16 (ALJ's RFC permitting light work with occasional lifting and carrying of twenty pounds, and frequent lifting an carrying of ten pounds; unlimited pushing and pulling; frequent fingering; and no limitation on reaching).

First, the Court recognizes that an ALJ is not required to "reproduce a list of [inconsistent] treatment records a second time when she explained why [Dr. Warren's opinion] was inconsistent with this record", *Crum v. Comm'r of Soc.* Sec, 660 F. App'x 449, 457 (6th Cir. 2016), but the earlier explanation and subsequent reference here falls short. The ALJ explained he found Dr. Warren's limitations unsupported because Plaintiff's "level of activities and physical examinations" were not consistent with a limitation to sedentary work. (Tr. 18-19). Earlier in his opinion, the ALJ pointed out Plaintiff could load the dishwasher, bathe and dress herself, assist with grocery shopping, clean her room, and occasionally walk her two dogs, as well as drive a car for as long as one hour. (Tr. 15). These findings are based on Plaintiff's testimony, but a review

18

of that testimony shows Plaintiff did not report doing these activities on a sustained basis. *See* Tr. 323-24, 327 (noting she could "grab a few things" at the pharmacy, did not shower every day because she "just did not have the energy to stand there", and walked her dogs approximately once per week). Further, elsewhere in her decision the ALJ noted there was evidence in the record Plaintiff was able to travel by car and airplane on vacations to Mexico, the Dominican Republic, and Florida. (Tr. 18). Again, this is supported by the record, but Plaintiff also testified that she spent most of her time sitting or in bed on one vacation (Tr. 342), and traveled in a wheelchair on another (Tr. 344). Without further explanation, it is unclear what about these particular activities the ALJ found inconsistent with Dr. Warren's opinion. Although it is an ALJ's duty, not this Court's, to review a claimant's credibility, *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 432, 542 (6th Cir. 2007), the Court finds this reference to Plaintiff's activities cannot supply the required "good reasons" to discount Dr. Warren's opinion. Moreover, the ALJ noted that Plaintiff's "physical examinations" were not consistent with limitation to sedentary work "as previously indicated above." (Tr. 19). Although the ALJ discussed some of the medical evidence of record on the prior pages (Tr. 17-18), it is not clear which records she contends are inconsistent with which of Dr. Warren's opined restrictions.

Second, even assuming the ALJ's explanation that she found the limitation "to a sedentary exertional level" unsupported by Plaintiff's "level of activities and physical examinations" were sufficient to address the rejection of limitations regarding sitting, standing, and walking, the opinion contains no explanation for her apparent rejection of other limitations such as those related to pushing pulling, and reaching. Thus, this cannot be harmless error, because the ALJ's decision does not "permit[] . . . [the] reviewing court a clear understanding for the reasons for the weight given" to the opinion. *Friend*, 375 F. App'x at 551. The ALJ did not make "some effort to identify

19

the specific discrepancies and to explain why it is the treating physician's conclusion . . . gets the short end of the stick" regarding these limitations. *Id.* at 552. And, as the Sixth Circuit explained in addressing *Wilson's* harmless error analysis:

> However, it is critical that, when reviewing the ALJ's reasoning for this purpose, we remember the goals of the procedural safeguard. We are reviewing the 1998 decision to see if it implicitly provides sufficient reasons for the rejection of Dr. Caudill's opinion regarding Hall's back, *see Wilson,* 378 F.3d at 544–45 (discussing purposes of treating-source regulations), not merely whether it indicates that the ALJ did reject Dr. Caudill's opinion.

*Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2005). Although the ALJ's opinion here certainly reflects that she "did reject" Dr. Warren's opinion, it does not "implicitly provide sufficient reasons" for that rejection. *Id.* As such, the undersigned declines to find harmless error.

The ALJ failed to provide "good reasons" for her determination of the weight assigned to Dr. Warren's opinion. That is, the ALJ failed to provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. Remand is therefore required.

Plaintiff contends that the evidence of her disability is overwhelming, and remand for an award of benefits is appropriate. (Doc. 12, at 15). When the ALJ's non-disability determination is unsupported by substantial evidence, the Court must determine whether to remand the matter for rehearing or to award benefits. Generally, benefits may be awarded immediately "if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990). The Court may only award benefits where proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where proof of disability is

overwhelming. *Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

In this case, the evidence of disability is not overwhelming. Although the ALJ committed legal error in her consideration of Dr. Warren's opinion, there are conflicting opinions regarding the severity of Plaintiff's impairments, and conflicting evidence in the record. Therefore, a remand for further proceedings is proper. On remand, the Commissioner should re-evaluate and explain her consideration of Dr. Warren's opinion and the weight assigned thereto.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and recommends the decision be reversed and remanded for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).